No. 22-30748

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

State of Louisiana; State of Alabama; State of Alaska; State of Arizona; State of Arkansas;
State of Florida; State of Georgia; State of Indiana; State of Iowa; State of Kansas;
Commonwealth of Kentucky; State of Mississippi; State of Missouri; State of Montana; State
of Nebraska; State of North Dakota; State of Ohio; State of Oklahoma; State of South
Carolina; State of South Dakota; State of Tennessee; State of Utah; State of West Virginia;
State of Wyoming; Sandy Brick,
Plaintiffs-Appellees,
v.

Xavier Becerra, in his official capacity as Secretary of Health & Human Services; United
States Department of Health and Human Services; Administration for Children & Families;
Jooyeun Chang, in her official capacity as Principal Deputy Assistant for Children &
Families; Bernadine Futrell, in her official capacity as the director of the Office of Head
Start; Joseph R. Biden, Jr.; Office of Head Start,
Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Western District of Louisiana

———————————

**BRIEF FOR APPELLANTS**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

BRANDON BONAPARTE BROWN
*United States Attorney*

ALISA B. KLEIN
SARAH CLARK
*Attorneys, Appellate Staff
Civil Division, Room 7235
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-1597 | alisa.klein@usdoj.gov*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are government entities and government officials sued in their official capacities.  5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

The federal government respectfully requests oral argument.  The district court permanently enjoined within the 24 plaintiff States the enforcement of an interim final rule issued by the Secretary of Health and Human Services requiring federally funded Head Start programs to ensure that their staff are vaccinated against COVID-19.  The district court held that the interim final rule exceeded the Secretary's statutory authority.  Oral argument is warranted given the importance of the issue.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.................................................................. 1

STATEMENT OF THE ISSUES ..................................................................... 1

STATEMENT OF THE CASE.......................................................................... 2

I.      Statutory And Regulatory Background ................................................ 2

    A.      The Head Start Program ........................................................... 2

    B.      Prior Regulations Requiring Grantees to Prevent the Spread
        of Contagious Disease in Head Start Programs....................... 4

    C.      The Interim Final Rule at Issue Here........................................ 8

II.     District Court Proceedings .................................................................11

SUMMARY OF ARGUMENT ......................................................................14

STANDARD OF REVIEW ............................................................................16

ARGUMENT ..................................................................................................16

I.      The Permanent Injunction Barring Enforcement Of The Head
    Start IFR's Vaccination Requirement Should Be Vacated On
    The Merits......................................................................................16

    A.      The Supreme Court's *Missouri* Decision Shows That the
        Head Start Vaccination Requirement Was Within the
        Secretary's Statutory Authority................................................16

    B.      The District Court's Reliance on the Major Questions
        Doctrine Is Foreclosed by the Supreme Court's Decision
        in the *Missouri* Case...............................................................25

II.     The Permanent Injunction Barring Enforcement Of The Head
        Start IFR's Masking Requirement Should Be Vacated As Moot
        Or, Alternatively, Vacated On The Merits ............................................................ 27

        A.     The Challenge to the Masking Requirement Is Moot
               Because the Masking Requirement Was Rescinded .......................... 27

        B.     The Masking Requirement Was Within the Secretary's
               Statutory Authority ............................................................................ 29

III.    Any Relief Should Be Limited To Plaintiff Sandy Brick And
        Any Head Start Grantees That Are Arms Of The Plaintiff States
        And Established Standing ................................................................................. 32

CONCLUSION ............................................................................................................. 40

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                                                    **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982) ............................................................................................ 37

*Biden v. Missouri*,
    142 S. Ct. 647 (2022) .................................................... 11-12, 16, 18, 20-21, 25-26, 29

*Brackeen v. Haaland*,
    994 F.3d 249 (5th Cir. 2021), *cert. granted*,
    142 S. Ct. 1205 (2022) ........................................................................................ 38

*California v. Texas*,
    141 S. Ct. 2104 (2021) ........................................................................................ 36

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ........................................................................................ 33, 34

*Florida v. Department of Health & Human Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ............................................................................ 12

*Freedom from Religion Found., Inc. v. Abbott*,
    58 F.4th 824 (5th Cir. 2023)................................................................................ 28

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022)......................................................................... 33, 35-36

*Lewis v. Casey*,
    518 U.S. 343, (1996) ........................................................................................ 33

*Livingston Educ. Serv. Agency v. Becerra*,
    35 F.4th 489 (6th Cir. 2022)........................................................................... 13, 16

*Louisiana v. Becerra*,
    20 F.4th 260 (5th Cir. 2021)................................................................................ 25

*Louisiana v. Becerra*,
    571 F. Supp. 3d 516 (W.D. La. 2021)............................................................... 11, 25

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................. 35

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ................................................................. 38

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ................................................................. 38

*MCI Telecomms. Corp. v. American Tel. & Tel. Co.*,
  512 U.S. 218 (1994) ............................................................. 24-25

*ODonnell v. Harris County*,
  892 F.3d 147 (5th Cir. 2018), *overruled on other grounds by*
  *Daves v. Dallas County*, 22 F.4th 522 (5th Cir. 2022) ............................................ 34

*Sossamon v. Lone Star State of Texas*,
  560 F.3d 316 (5th Cir. 2009) ................................................... 29

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ................................................................. 38

*Spell v. Edwards*,
  962 F.3d 175 (5th Cir. 2020) ................................................... 28

*Texas v. Equal Emp't Opportunity Comm'n*,
  933 F.3d 433 (5th Cir. 2019) ................................................... 16

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ................................................... 39

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ................................................... 38

*United States v. Castelo-Palma*,
  30 F.4th 284 (5th Cir. 2022) ................................................... 16

*United States v. Munsingwear*,
  340 U.S. 36 (1950) ................................................................. 29

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ................................................................................ 26-27

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .............................................................................................. 34

## Statutes:

Head Start Act,
    Pub. L. No. 97-35, 95 Stat. 357 (1981) ............................................................ 2

Headstart–Follow Through Act,
    Pub. L. No. 93-644, 88 Stat. 2291 (1975) .................................................. 2-4, 22-23

Human Services Amendments of 1994,
    Pub. L. No. 103-252, 108 Stat. 623 ........................................................ 2, 3, 23

Improving Head Start for School Readiness Act of 2007,
    Pub. L. No. 110-134, 121 Stat. 1363 ....................................................... 2, 23

28 U.S.C. § 1291 ................................................................................................ 1

28 U.S.C. § 1331 ................................................................................................ 1

## Regulations:

45 C.F.R. § 1302.15(e) ...................................................................................... 32

45 C.F.R. § 1302.42 .......................................................................................... 18

45 C.F.R. § 1302.47(a) ........................................................................................ 7

45 C.F.R. § 1302.47(a)(1) .................................................................................. 18

45 C.F.R. § 1302.47(b)(1)(iii) ............................................................................ 22

45 C.F.R. § 1302.47(b)(4)(i)(A) ..................................................................... 7, 18

45 C.F.R. § 1302.47(b)(6) .................................................................................. 30

45 C.F.R. § 1302.47(b)(7)(iii) ...........................................................7, 18

45 C.F.R. § 1302.91 ............................................................................. 18

45 C.F.R. § 1302.93(a) ............................................................................7

45 C.F.R. § 1304.3-3(d) (1975) ........................................................5, 19

45 C.F.R. § 1304.22(e)(1) (1997) ......................................................... 30

45 C.F.R. § 1304.22(e)(2) (1997) ......................................................... 30

45 C.F.R. § 1304.22(e)(3) (1997) ......................................................... 30

45 C.F.R. § 1304.52(j) (1997) ............................................................... 19

45 C.F.R. § 1304.52(j)(1) (1997) ........................................................6, 19

45 C.F.R. § 1304.52(j)(2) (1997) ........................................................6, 19

45 C.F.R. § 1304.53(a)(8) (1997) ......................................................... 22

*Head Start Performance Standards*,
   81 Fed. Reg. 61,294 (Sept. 6, 2016)..............................................7, 22, 30, 32

*Head Start Program*,
   61 Fed. Reg. 57,186 (Nov. 5, 1996)......................................6, 8, 19, 22, 23, 30, 32

*Mitigating the Spread of COVID-19 in Head Start Programs*,
   88 Fed. Reg. 993 (Jan. 6, 2023)................................................. 26-29

Office of Child Dev., U.S. Dep't of Health, Educ., & Welfare,
   OCD-N-30-364-4, *Head Start Program Performance
   Standards* (1975)............................................................................. 6

Office of Head Start, *HHS, CDC Community Levels
   Recommendations and Mask Wearing*,
   https://perma.cc/Y5YS-D3CC ....................................................... 27

*Program Performance Standards for Operation of Head Start
   Programs by Grantees and Delegate Agencies*,

40 Fed. Reg. 27,562 (June 30, 1975) .........................................................................5, 19

*Vaccine and Mask Requirements To Mitigate the Spread of*
  *COVID-19 in Head Start Programs*,
  86 Fed. Reg 68,052 (Nov. 30, 2021)..............................................8-10, 17, 21, 26-29

**Other Authorities:**

CDC, *Tuberculosis (TB), Testing for TB Infection*
  (Aug. 30, 2022), https://perma.cc/TB8Z-J25U....................................................6, 19

Forum on Child & Family Statistics, *POP1 Child Population:*
  *Number of Children (in Millions) Ages 0-17 in the*
  *United States by Age, 1950-2020 and Projected 2021-2050*,
  https://perma.cc/8EU9-V2HA......................................................................... 26

Paul French, *In the 1918 Flu Pandemic, Not Wearing a Mask*
  *Was Illegal in Some Parts of America.  What Changed?*, CNN,
  https://perma.cc/7UKE-4S9Y (last updated Apr. 4, 2020) ............................... 31

Yale Med., *Why Doctors Wear Masks* (Sept. 1, 2020),
  https://perma.cc/9W9J-6F3U........................................................................... 31

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.42, 24564.  The district court entered a permanent injunction on September 21, 2022.  ROA.24541.  Defendants filed a timely notice of appeal on November 18, 2022.  ROA.24544.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Plaintiffs challenged an interim final rule (IFR) issued by the Secretary of Health and Human Services (HHS).  The IFR required entities that receive federal grants under the Head Start program to ensure that their staff are vaccinated against COVID-19.  The IFR also included a masking requirement, but that requirement has been rescinded.  The district court entered a permanent injunction barring enforcement of the IFR against Head Start grantees within the 24 plaintiff States on the ground that the IFR exceeded the Secretary's statutory authority.  The questions presented are:

1.  Whether the permanent injunction barring enforcement of the IFR's vaccination requirement should be vacated on the merits because the vaccination requirement was within the Secretary's statutory authority.

2.  Whether the permanent injunction barring enforcement of the IFR's masking requirement should be vacated as moot because the masking

requirement was rescinded or, alternatively, vacated on the merits because the masking requirement was within the Secretary's statutory authority.

3.  Whether any relief should be narrowed to reach only plaintiff Sandy Brick and any Head Start grantees that are arms of the plaintiff States and have demonstrated standing.

## STATEMENT OF THE CASE

## I.    Statutory And Regulatory Background

### A.    The Head Start Program

Head Start is a federal grant program that provides health, educational, nutritional, social, and other services for low-income infants, toddlers, pre-school children, and their families.  42 U.S.C. §§ 9831, 9840a.  Head Start began as a demonstration grant in 1964 as part of President Lyndon B. Johnson's War on Poverty.  In 1975, Congress enacted legislation that authorized and extended the Head Start program.  *See* Headstart–Follow Through Act, Pub. L. No. 93-644, § 8, 88 Stat. 2291, 2300 (1975).  In the decades since that time, Congress has repeatedly reauthorized the Head Start program as amended.  *See, e.g.*, Head Start Act, Pub. L. No. 97-35, §§ 635-636, 95 Stat. 357, 499 (1981); Head Start Act Amendments of 1994, Pub. L. No. 103-252, § 101, 108 Stat. 623, 624; Improving Head Start for School Readiness Act of 2007, Pub. L. No. 110-134, 121 Stat. 1363.

The statutory provisions that govern Head Start are now codified at
42 U.S.C. § 9831 *et seq*.  Congress has vested responsibility for the program in
the Secretary of Health and Human Services, who designates private
organizations and local public agencies to receive Head Start grants.  42 U.S.C.
§ 9836.

Since the inception of the program, Head Start grantees have been
required to meet performance standards set by the HHS Secretary or his
predecessor, the Secretary of Health, Education, and Welfare.  *See, e.g.*,
Headstart–Follow Through Act, Pub. L. No. 93-644, § 8, 88 Stat. 2291, 2300,
2303 (adding section 517) (authorizing the Secretary to prescribe rules and
regulations that set standards for Head Start grantees); Human Services
Amendments of 1994, Pub. L. No. 103-252, § 108, 108 Stat. 623, 631 (adding
section 641A) (authorizing the Secretary to "establish by regulation standards
applicable to Head Start" grantees).  The legislation now in effect, which was
enacted as part of the Head Start program's 2007 reauthorization, authorizes
the HHS Secretary to "modify, as necessary, program performance standards
by regulation applicable to Head Start" grantees.  42 U.S.C. § 9836a(a)(1).
These performance standards include standards that address the services
offered, *see id.* § 9836a(a)(1)(A); standards related to school readiness, *id*.
§ 9836a(a)(1)(B); "administrative and financial management standards," *id.*

3

§ 9836a(a)(1)(C); "standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate)," *id.* § 9836a(a)(1)(D); and "such other standards as the Secretary finds to be appropriate," *id.* § 9836a(a)(1)(E).

Congress directed the Secretary to monitor grantees for compliance with the performance standards.  42 U.S.C. § 9836a(c).  Congress authorized the Secretary to require corrective action if a grantee fails to comply with a performance standard, and to require immediate corrective action if such a failure "threatens the health or safety" of participating children or staff.  *Id.* § 9836a(e)(1)(B)(i); *see also id.* § 9832(2)(A) (defining a "deficiency" in a grantee's compliance to include a substantial material failure "in an area of performance that the Secretary determines involves . . . a threat to the health, safety, or civil rights of children or staff").

## B.    Prior Regulations Requiring Grantees to Prevent the Spread of Contagious Disease in Head Start Programs

Providing "health . . . services" to low-income children and their families has always been a major component of Head Start.  42 U.S.C. § 9831; *see also id.* § 9852c(c) (defining "the term 'health,' when used to refer to services or care provided to enrolled children" or their family members, "to refer to both physical and mental health"); Pub. L. No. 93-644, § 8, 88 Stat. 2300

(authorizing and extending the Head Start program "[i]n recognition of the role which" the original demonstration project "has played in the effective delivery of comprehensive *health*, educational, nutritional, social, and other services to economically disadvantaged children and their families" (emphasis added)).

To ensure that grantees' operations do not undermine the objective of improving participants' health, the Secretary's performance standards have always required Head Start grantees to prevent the spread of contagious disease within their programs, including through requirements directed at Head Start personnel. Under the 1975 regulations, for example—which were issued in the same year that Congress authorized Head Start as a national program—Head Start grantees were required to ensure, in accordance with local and state health regulations, "that employed program staff have initial health examinations, periodic check-ups, and are found to be free from communicable disease; and, that voluntary staff be screened for tuberculosis." *Program Performance Standards for Operation of Head Start Programs by Grantees and Delegate Agencies*, 40 Fed. Reg. 27,562, 27,565 (June 30, 1975) (45 C.F.R. § 1304.3-3(d) (1975)). Similarly, the 1996 regulations required grantees to ensure that "each staff member has an initial health examination that includes screening for tuberculosis and a periodic re-examination" so that

"they do not, because of communicable diseases, pose a significant risk to the health or safety of others in the" program. *Head Start Program*, 61 Fed. Reg. 57,186, 57,223 (Nov. 5, 1996) (45 C.F.R. § 1304.52(j)(1) (1997)). The 1996 regulations likewise required that "[r]egular volunteers must be screened for tuberculosis." *Id*. (45 C.F.R. § 1304.52(j)(2) (1997)).

Tuberculosis screening commonly entails a skin test that "is performed by injecting a small amount of fluid (called tuberculin) into the skin on the lower part of the arm." Centers for Disease Control & Prevention (CDC), *Tuberculosis (TB), Testing for TB Infection* (Aug. 30, 2022).[1] The 1975 guidance for Head Start grantees indicated that, in addition to a skin test, chest x-rays—that is, radiation—could be administered to comply with the requirement to test staff and volunteers for TB. Office of Child Dev., U.S. Dep't of Health, Educ., & Welfare, OCD-N-30-364-4, *Head Start Program Performance Standards* at 26 (1975).[2]

In 2016, in response to public comments that it no longer made sense to single out tuberculosis, HHS revised its standards to establish a broader

---

[1] https://perma.cc/TB8Z-J25U

[2] The 1975 program standards are a matter of public record and are available at Plaintiffs' Reply Brief in Support of Motion for Preliminary Injunction, Exhibit. B, *Livingston Educational Service Agency v. Becerra*, No. 22-cv-10127, ECF 39-3 (E.D. Mich. Feb. 22, 2022), Dkt. No. 39-3.

requirement that Head Start staff be periodically tested for communicable diseases. *See Head Start Performance Standards*, 81 Fed. Reg. 61,294, 61,357, 61,433 (Sept. 6, 2016). The 2016 regulations, which remain in effect, require grantees to "ensure staff do not, because of communicable diseases, pose a significant risk to the health or safety of others in the program," 45 C.F.R. § 1302.93(a), and require that all Head Start personnel have "an initial health examination and a periodic re-examination as recommended by their health care provider in accordance with state, tribal, or local requirements, that include screeners or tests for communicable diseases, as appropriate," *id.*

More generally, the Secretary's "[s]afety practices" standards require Head Start grantees to "establish, train staff on, implement, and enforce a system of health and safety practices that ensure children are kept safe at all times." 45 C.F.R. § 1302.47(a). That system must include the establishment and implementation of appropriate procedures for "[p]rotection from contagious disease," *id.* § 1302.47(b)(7)(iii), as well as staff training on the "prevention and control of infectious diseases," *id.* § 1302.47(b)(4)(i)(A). Such infection-control measures must be implemented even if they reduce the number of children that a Head Start grantee can serve. For example, emphasizing "the importance of avoiding the spread of contagious illness," the Secretary has in the past required protective measures such as the spacing of

7

cribs and cots three feet apart despite concerns that such measures increased

costs and reduced the number of children that grantees can serve.  61 Fed.

Reg. at 57,196.  Moreover, grantees have long been required to "exclude

children who have short-term acute conditions that are contagious and pose

an immediate risk to others in Early Head Start and Head Start settings."  *Id.*

### C.    The Interim Final Rule at Issue Here

Beginning in spring 2020, more than 90% of Head Start programs

closed all in-person operations for varying lengths of time due to COVID-19.

*Vaccine and Mask Requirements To Mitigate the Spread of COVID-19 in Head*

*Start Programs*, 86 Fed. Reg. 68,052, 68,058 (Nov. 30, 2021).  Once vaccines

became widely available, the Secretary informed grantees that Head Start

programs were expected to resume fully in-person service beginning in

January 2022.  *Id.* at 68,058, 60,062.

To promote the safe resumption of in-person operations, the Secretary

issued the interim final rule at issue here, which required Head Start

programs to ensure that their staff (including contractors and volunteers)

who interact directly with students were vaccinated against COVID-19,

subject to religious and medical exemptions.  86 Fed. Reg. at 68,060-61.  The

IFR set a January 31, 2022, deadline for staff members to receive a single-shot

vaccine, obtain the second shot of a two-dose vaccine, or request an exemption from their employer.  *Id.* at 68,052.[3]

The Secretary made detailed findings in support of the IFR's vaccination requirement.  The Secretary found that it was "necessary and appropriate to set health and safety standards for the condition of Head Start facilities that ensure the reduction in transmission of [COVID-19] and to avoid severe illness, hospitalization, and death among program participants."  86 Fed. Reg. at 68,054.  He concluded that staff vaccination was one of the best available defenses against COVID-19, emphasizing that most Head Start participants were at that time too young to be vaccinated and that physical distancing is difficult in early childhood settings.  *Id.* at 68,054-55.

The Secretary further concluded that the staff-vaccination requirement was important to enable Head Start programs to resume safe in-person operations.  He explained that COVID-19 had forced the vast majority of Head Start programs to shutter in-person operations for varying lengths of time starting in the spring of 2020 and that "[p]rograms need[ed] to be able to resume fully in-person services to meet the needs" of the low-income children

---

[3] The IFR also imposed a masking requirement but, as explained in Part II of the Argument below, the Secretary stopped monitoring compliance with the masking requirement in February 2022 and has since rescinded it.

and families that the programs serve.  86 Fed. Reg. at 68,058; *see also id*. at

68,054.  Based on studies and consultations with experts, the Secretary found

that closures "disrupt children's opportunities for learning, socialization,

nutrition, and continuity and routine."  *Id.* at 68,057-58.  Moreover, closures

"impose[] significant financial costs on Head Start families" by requiring

parents without childcare support to stay home.  *Id.*

　　　The Secretary found good cause to issue the IFR without advance notice

and comment, concluding that delaying the effective date of the IFR would be

"impracticable and contrary to the public interest" because it "would

endanger the health and safety of staff, children and families."  86 Fed. Reg. at

68,059.  The United States had experienced a surge of COVID-19 cases the

previous winter, *id.* at 68,058, and the Delta variant—which was causing

increased hospitalization rates in children—seemed poised to fuel another

winter wave, *id.* at 68,052 & n.4, 68,054 & n.26.  There was therefore the

potential for "devastating consequences" for children and families due to

program closures and service interruptions.  *Id.* at 68,054.  Because Head Start

programs were expected to resume fully in-person services in January 2022,

the Secretary found that it was imperative that staff be vaccinated

expeditiously.  *Id.* at 68,062.

## II.     District Court Proceedings

The judge who presided over this case also issued one of the preliminary injunctions that the Supreme Court reviewed in *Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam).  The *Missouri* litigation involved a similar IFR requiring facilities that receive federal funding under Medicare or Medicaid to ensure that their staff are vaccinated against COVID-19.  *Id.* at 650.  There, the district court ruled that the staff-vaccination requirement exceeded the HHS Secretary's statutory authority, that it was arbitrary and capricious, and that the Secretary lacked good cause to issue the IFR without advance notice and comment.  *See Louisiana v. Becerra*, 571 F. Supp. 3d 516 (W.D. La. 2021).

After hearing oral argument, the Supreme Court stayed that preliminary injunction in a reasoned opinion that rejected the challenges to the IFR on the merits.  As particularly relevant here, the Supreme Court concluded that the staff-vaccination requirement fell within the Secretary's statutory authority to protect "the health and safety of individuals who are furnished services" at the federally funded healthcare facilities.  *Missouri*, 142 S. Ct. at 652 (citation omitted).  The Supreme Court recognized that the Secretary had not previously imposed a staff-vaccination requirement for such facilities but emphasized that the Secretary has "never had to address an infection problem

11

of this scale and scope before." *Id*. at 653. The Court observed that the

Secretary had long required facilities to implement other infection-control

measures, such as training for personnel on infection prevention and control

guidelines. *See id*. at 652-53. And the Court emphasized that "[i]t would be

the 'very opposite of efficient and effective administration for a facility that is

supposed to make people well to make them sick with COVID-19.'" *Id*. at 652

(quoting *Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1288

(11th Cir. 2021)).

Shortly before the Supreme Court issued that decision in *Missouri*, the

district court in this case entered a preliminary injunction that blocked

enforcement of the Head Start IFR within the 24 plaintiff States. *See Louisiana*

*v. Becerra*, 577 F. Supp. 3d 483 (W.D. La. 2022). The district court ruled that

the Head Start IFR exceeded the Secretary's statutory authority and that the

Secretary lacked good cause to issue the IFR without advance notice and

comment. *Id.* at 494-501.

After the Supreme Court issued its decision in *Missouri*, the government

moved in this case to dismiss the complaint and for summary judgment,

explaining that the Supreme Court's reasoning forecloses plaintiffs' challenges

to the Head Start IFR. ROA.23656-23657. The district court denied that

motion and entered a permanent injunction barring enforcement of the Head

12

Start IFR against grantees located within the 24 plaintiff States. *See* ROA.24541 (order). In the accompanying opinion, the district court ruled that the staff-vaccination requirement exceeds the Secretary's statutory authority. *Louisiana v. Becerra*, __ F. Supp. 3d __, No. 3:21-CV-04370, 2022 WL 4370448, at *7-12 (W.D. La. Sept. 21. 2022). In so ruling, the district court expressly declined (at *12) to follow the contrary reasoning of the Sixth Circuit motions panel in *Livingston Educational Service Agency v. Becerra*, 35 F.4th 489, 491-92 (6th Cir. 2022), which had denied a motion to stay the Head Start IFR on the ground that the plaintiffs were unlikely to succeed on the merits of their challenge to the Secretary's statutory authority.[4]

---

[4] The plaintiffs in *Livingston* filed a petition for rehearing en banc, which was denied without recorded dissent. *See Livingston Educ. Serv. Agency v. Becerra*, No. 22-1257, 2022 WL 2286410(6th Cir. June 21, 2022). The Sixth Circuit heard oral argument on the merits of the plaintiffs' appeal on January 25, 2023.

## SUMMARY OF ARGUMENT

The interim final rule at issue here required that personnel in federally funded Head Start programs be vaccinated against COVID-19 (subject to exemptions).  Like the IFR that the Supreme Court upheld in *Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam), the Head Start IFR was a proper exercise of the HHS Secretary's statutory authority to protect the health and safety of the vulnerable participants in this federal grant program—many of whom were too young to be vaccinated against COVID-19 when the IFR was issued. The IFR was likewise an appropriate measure to facilitate the safe reopening of Head Start programs, many of which had been shuttered due to COVID-19 in the period leading up to the IFR.

In ruling to the contrary, the district court replicated the errors that it made in the preliminary injunction at issue in the *Missouri* litigation.  The district court failed to address the specific statutory text that shows that the Secretary is authorized to establish standards to protect the health and safety of Head Start participants.  The district court failed to acknowledge the Secretary's historical use of such authority to require tuberculosis testing of Head Start personnel (an invasive procedure) and, more generally, to require Head Start grantees to prevent the spread of communicable disease in their programs.  In relying on the major questions doctrine, the district court failed

14

to recognize that the impact of the Head Start IFR is even more modest than was the impact of the IFR at issue in *Missouri*, where the Supreme Court upheld the rule despite the plaintiffs' heavy reliance on the major questions doctrine.

To the extent that the district court also enjoined the IFR's masking requirement, that injunction should be vacated as moot because the masking requirement was rescinded. Assuming the issue is not moot, the injunction should be vacated on the merits because the masking requirement fell easily within the Secretary's authority to protect the health and safety of Head Start participants and to facilitate the safe reopening of Head Start programs.

The district court compounded its errors by permanently enjoining enforcement of the IFR against every Head Start grantee located within the 24 plaintiff States. Assuming arguendo that there is a basis to affirm any relief, such relief should be confined to plaintiff Sandy Brick (who works at a Head Start center) and to those Head Start grantees that are arms of a plaintiff State and demonstrated standing through record evidence.

15

## STANDARD OF REVIEW

This Court reviews de novo the district court's legal rulings. *United States v. Castelo-Palma*, 30 F.4th 284, 286 (5th Cir. 2022). The scope of the injunction is likewise reviewed de novo. *Texas v. Equal Emp't Opportunity Comm'n*, 933 F.3d 433, 450 (5th Cir. 2019).

## ARGUMENT

### I.    The Permanent Injunction Barring Enforcement Of The Head Start IFR's Vaccination Requirement Should Be Vacated On The Merits.

#### A.    The Supreme Court's *Missouri* Decision Shows That the Head Start Vaccination Requirement Was Within the Secretary's Statutory Authority.

**1.** The IFR's requirement that Head Start personnel be vaccinated against COVID-19 should be upheld under the Supreme Court's reasoning in *Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam), which upheld a similar IFR requiring COVID-19 vaccination for staff of facilities that receive funding under Medicare or Medicaid. As the Sixth Circuit motions panel recognized in *Livingston Educational Service Agency v. Becerra*, 35 F.4th 489 (6th Cir. 2022), the similarities between the two IFRs are striking.

First, both IFRs involve federally funded programs designed to improve the health of the participants. Just as Medicare and Medicaid aim to improve the health of the vulnerable populations served, a central objective of Head

Start is to provide "health . . . services" to low-income children, 42 U.S.C.
§ 9831—many of whom were too young to be vaccinated against COVID-19
when the IFR was issued, *see* 86 Fed. Reg. at 68,055; *see also id.* at 68,054
(emphasizing "the disproportionate effect of COVID-19 on low-income
communities served by Head Start agencies").

Second, as in *Missouri*, the text of the Head Start statute makes explicit
that the HHS Secretary may set standards to protect the health and safety of
the children served.  Congress authorized the Secretary to establish
performance standards for grantees including "administrative and financial
management standards," 42 U.S.C. § 9836a(a)(1)(C), "standards relating to the
condition and location of facilities (including indoor air quality assessment
standards, where appropriate)," *id.* § 9836a(a)(1)(D), and "such other
standards as the Secretary finds to be appropriate," *id.* § 9836a(a)(1)(E).
Congress directed the Secretary to monitor grantees for compliance with the
performance standards.  *Id.* § 9836a(c).  And Congress specified that the
Secretary may require immediate corrective action if a grantee's failure to
comply with a performance standard "*threatens the health or safety*" of
participating children or staff.  *Id.* § 9836a(e)(1)(B)(i) (emphasis added).
Indeed, Congress defined a deficiency warranting immediate corrective action
as a significant material failure "*in an area of performance* that the Secretary

17

determines involves . . . a *threat to the health, safety*, or civil rights of children or staff." *Id*. § 9832(2)(A) (emphasis added). The emphasized statutory text leaves no doubt that underlying performance standards set by the Secretary may protect the health and safety of the children enrolled in Head Start. As in *Missouri*, it "would be the very opposite of efficient and effective administration" for a program "that is supposed to make people well to make them sick with COVID-19." *Missouri*, 142 S. Ct. at 652 (quotation marks omitted).

Third, as in *Missouri*, the Secretary has long used the standard-setting authority to impose a "litany of health-related participation conditions." *Missouri*, 142 S. Ct. at 653. Such standards address both the health services that grantees must provide, *see, e.g.*, 45 C.F.R. § 1302.42, and the qualifications and duties of the workers themselves, *see, e.g.*, *id*. § 1302.91. Grantees are required to "establish, train staff on, implement, and enforce a system of health and safety practices that ensure children are kept safe at all times." *Id.* § 1302.47(a)(1). And as in *Missouri*, the standards require grantees to establish and implement procedures for "[p]rotection from contagious disease," *id*. at § 1302.47(b)(7)(iii); *see also id*. § 1302.47(b)(4)(i)(A) (requiring staff training on the "prevention and control of infectious diseases).

18

Especially pertinent here, the longstanding Head Start standards—which plaintiffs have never challenged—specifically addressed "[s]taff and volunteer health." *E.g.*, 61 Fed. Reg. at 57,223 (45 C.F.R. § 1304.52(j) (1997)). For example, under the first set of standards that was issued in 1975—the same year that Congress authorized Head Start as a national program—grantees were required to ensure that staff and volunteers were tested for tuberculosis (TB). 40 Fed. Reg. at 27,565 (45 C.F.R. § 1304.3-3(d) (1975)). That TB testing requirement was carried forward in the 1996 regulations to ensure that Head Start personnel "do not, because of communicable diseases, pose a significant risk to the health or safety of others in the" program. 61 Fed. Reg. at 57,223 (45 C.F.R. § 1304.52(j)(1) (1997)); *see also id.* (45 C.F.R. § 1304.52(j)(2) (1997) (requiring TB testing of regular volunteers)).

As the CDC has explained, TB testing routinely entails a skin test, which "is performed by injecting a small amount of fluid (called tuberculin) into the skin on the lower part of the arm." *Tuberculosis (TB), Testing for TB Infection*, *supra*. The 1975 guidance for Head Start grantees further indicated that, in addition to tuberculin testing, chest x-rays—that is, radiation—could be used to comply with the requirement to test staff and volunteers for TB. *See supra*, p. 6 & n.2. In other words, the historical standards for Head Start grantees went beyond the historical standards on which the Supreme Court relied in

19

*Missouri* by requiring what, in the district court's own parlance, would be described as "specific medical treatments" for Head Start personnel to protect the health and safety of the children served. *Louisiana v. Becerra*, __ F. Supp. 3d __, No. 3:21-CV-04370, 2022 WL 4370448, at *11 (W.D. La. Sept. 21, 2022).

**2.** The district court's contrary reasoning is unfounded. The district court declared, incorrectly, that the Secretary's previous Head Start program standards did not "impose specific medical treatments on anyone" and merely imposed "training to identify medical issues that can be referred for medical treatment." *Louisiana*, 2022 WL 4370448, at *11.

That reasoning rests on two independent errors. First, as just explained, the Head Start program standards have since the inception required staff and regular volunteers to be tested for tuberculosis, which generally entailed an injection or x-ray. Second, the Supreme Court in *Missouri* emphasized that the absence of a prior staff-vaccination requirement was not a sound reason to deem unauthorized the requirement that staff in federally funded programs be vaccinated against COVID-19—a novel virus that was highly contagious and deadly. The Supreme Court explained that "[o]f course the vaccine mandate goes further than what the Secretary has done in the past to implement infection control," but emphasized that the Secretary "has never had to address an infection problem of this scale and scope before." *Missouri*,

142 S. Ct. at 653.  The Supreme Court reasoned that, "[i]n any event, there can be no doubt that addressing infection problems in Medicare and Medicaid facilities is what he does."  *Id*.  Here, too, the Secretary has long addressed infection problems in Head Start programs.  Accordingly, under the reasoning of *Missouri*, the Head Start IFR's vaccination requirement falls within the Secretary's statutory authority.

Furthermore, as in *Missouri*, "the Secretary routinely imposes conditions of participation that relate to the qualifications and duties of [Head Start] workers themselves," which belies any contention that the Secretary's role is that of "mere bookkeeper."  *Missouri*, 142 S. Ct. at 653.  As the Secretary explained in issuing the IFR, a central objective of the staff-vaccination requirement was to allow Head Start programs—the vast majority of which had been shuttered for varying lengths of time due to COVID-19—to resume fully in-person service beginning in January 2022.  *See* 86 Fed. Reg. at 68,058, 68,062.  It is difficult to imagine an administrative standard that is more appropriate than one designed to enable grantees to provide the very services for which the federal grants are made.

The district court was likewise wrong to declare that the Secretary's authority to set standards "relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate)," 42

21

U.S.C. § 9836a(a)(1)(D), does not encompass include IFR's staff-vaccination requirement.  The district court reasoned that the vaccination requirement "deals with the condition of Head Start . . . volunteers, and workers," "not with the condition of the facilities."  *Louisiana*, 2022 WL 4370448, at *9.  That is a false dichotomy.  The IFR required staff and volunteers to be vaccinated against COVID-19 as a means to protect the air quality at Head Start facilities.  The vaccination requirement is thus similar to the longstanding prohibition on smoking in Head Start facilities.  *See* 61 Fed. Reg. at 57,224 (45 C.F.R. § 1304.53(a)(8) (1997)) (providing that grantees "must provide a center-based environment *free of toxins, such as cigarette smoke*, lead, pesticides, herbicides, and other air pollutants" (emphasis added)); *see also* 81 Fed. Reg. at 61,340 (explaining that the requirement in the current standards that facilities be "[f]ree from pollutants" encompasses cigarette smoke (citing 45 C.F.R. § 1302.47(b)(1)(iii)).  Just as the cigarette smoke that Head Start personnel exhale would threaten the health and safety of the children in their charge, the same is true of the viral particles that cause COVID-19.

**3.**  The district court's reliance on the statutory term "modify," *Louisiana*, 2022 WL 4370448, at *8, was wholly misplaced.  From the inception of the Head Start program, Congress authorized the Secretary to "prescribe" rules and regulations that set standards for Head Start grantees.

22

Pub. L. No. 93-644, § 8, 88 Stat. 2300, 2303 (adding section 517). The 1994

legislation reauthorizing the program similarly provided that "[t]he Secretary

shall establish by regulation standards applicable to Head Start" grantees,

including performance standards related to the services provided,

administrative and financial management standards, standards relating to the

condition and location of facilities, and such other standards as the Secretary

finds to be appropriate. Pub. L. No. 103-252, § 108, 108 Stat. 623, 631 (adding

section 641A). In 2007, when Congress reauthorized the program, Congress

provided that "[t]he Secretary shall modify, *as necessary*, program

performance standards by regulation applicable to Head Start" grantees. Pub.

L. No. 110-134, § 8, 121 Stat. 1363, 1385 (amending section 641A) (emphasis

added).

Contrary to the district court's understanding, the 2007 legislation did

not confine the Secretary to making only "moderate or minor changes" to the

prior Head Start regulations. *Louisiana*, 2022 WL 4370448, at *8. The 2007

legislation made explicit that the Secretary can modify the standards "as

necessary." *Id*. at *7. The Secretary has long modified Head Start standards to

meet the most pressing needs of the time, including health issues. In the

1990s, for example, the Secretary addressed the appropriate treatment of

children with HIV. *See* 61 Fed. Reg. at 57,196. The IFR at issue here likewise

modified the standards as necessary to protect the children enrolled in Head Start against the novel threat posed by COVID-19. Indeed, even if the Secretary were confined to making only minor or moderate changes to the Head Start standards, the IFR would qualify in light of the longstanding requirement that grantees prevent the spread of communicable disease in their programs, including through TB-testing of staff.

The district court relied on the Supreme Court's decision in *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994), but that decision is inapposite on its face. That case concerned a statutory requirement that communications common carriers file tariffs with the Federal Communications Commission (FCC). *See id.* at 220. The Supreme Court held that the FCC's authority to "modify" statutory requirements did not encompass the authority to make the tariff-filing requirement optional, which the Supreme Court described as a "radical or fundamental change in the Act's tariff-filing requirement." *Id.* at 229.

Unlike *MCI*, which involved a tariff requirement imposed by statute as part of a regulatory program, this case involves standards set by regulation as part of a federal grant program. For the reasons already discussed, the Secretary's authority to modify program standards is not limited to minor or

moderate changes.  And in any event, the IFR was not a "radical or

fundamental change" to the Head Start standards.  *MCI*, 512 U.S. at 229.

### B.    The District Court's Reliance on the Major Questions Doctrine Is Foreclosed by the Supreme Court's Decision in the *Missouri* Case.

The district court's reliance on the major questions doctrine, *Louisiana*,

2022 WL 4370448, at *11, replicates the error that it made in the *Missouri*

case.  There, as here, the district court ruled that the major questions doctrine

was reason to enjoin the IFR.  *Louisiana v. Becerra*, 571 F. Supp. 3d 516, 536

(W.D. La. 2021).  This Court, in declining to stay that earlier injunction,

reasoned that "the Secretary will have the most difficulty overcoming the part

of the ruling that applied the 'major questions doctrine.'"  *Louisiana v. Becerra*,

20 F.4th 260, 262 (5th Cir. 2021) (per curiam).  And the *Missouri* plaintiffs'

briefing before the Supreme Court relied heavily on the major questions

doctrine.  *See* Response to Application for a Stay Pending Appeal, *Becerra v.

Louisiana*, Nos. 21A240, 21A241, 2021 WL 8939385, at *22-23 (U.S. Dec. 30,

2021); Response to Application for a Stay, *Biden v. Missouri*, No. 21A240, 2021

WL 8946189, at *22-24 (U.S. Dec. 30, 2021).

The Supreme Court was unpersuaded and upheld the IFR in *Missouri*.

The district court's reliance on the major questions doctrine here is even less

persuasive.  Whereas the IFR at issue in *Missouri* affected more than

10 million workers, *see Missouri*, 142 S. Ct. at 655 (Thomas, J., dissenting), the IFR at issue here affected just 273,000 Head Start workers, 86 Fed. Reg. at 68,077, and a share of volunteers who interact with children in certain in-person settings, *see id.* at 68,068 (estimating a total of 1 million volunteers); *Mitigating the Spread of COVID-19 in Head Start Programs*, 88 Fed. Reg. 993, 1003 (Jan. 6, 2023) (adopting a more recent estimate of fewer than 500,000 volunteers).  Furthermore, only a miniscule fraction of children under age 6 are enrolled in Head Start programs.[5]  If a particular Head Start grantee is unwilling or unable to comply with the program standards, it is free to relinquish its federal grant and provide early childhood services through a non-Head Start program instead.

Contrary to the district court's understanding, "the Supreme Court's decision in *West Virginia v. EPA*" did not give lower courts license to disregard the Supreme Court's decision in the *Missouri* case.  *Louisiana*, 2022 WL 4370448, at *12.  In *West Virginia*, the Supreme Court reasoned that the challenged rule would drive an "aggressive transformation in the domestic

---

[5] *Compare* 86 Fed. Reg. at 68,077 (chart indicating that approximately 864,000 children were enrolled in Head Start programs in 2020), *with* Forum on Child & Family Statistics, *POP1 Child Population: Number of Children (in Millions) Ages 0-17 in the United States by Age, 1950-2020 and Projected 2021-2050*, https://perma.cc/8EU9-V2HA (chart indicating that there were approximately 23.4 million children under age 6 in the United States in 2020).

energy industry" that "would cause retail electricity prices to remain persistently 10% higher in many States" and "reduce GDP by at least a trillion 2009 dollars by 2040." *West Virginia v. EPA*, 142 S. Ct. 2587, 2604 (2022) (quotation marks omitted).  Nothing in that opinion remotely suggested that the Head Start IFR implicates the major questions doctrine.  The permanent injunction barring enforcement of the IFR's vaccination requirement thus should be vacated on the merits.

## II.    The Permanent Injunction Barring Enforcement Of The Head Start IFR's Masking Requirement Should Be Vacated As Moot Or, Alternatively, Vacated On The Merits.

### A.    The Challenge to the Masking Requirement Is Moot Because the Masking Requirement Was Rescinded.

The permanent injunction barring enforcement of the IFR's masking requirement should be vacated as moot.  Originally, the IFR required Head Start grantees to ensure that Head Start personnel and participants age 2 or older wear masks to prevent the spread of COVID-19 (subject to exemptions).  *See* 86 Fed. Reg. at 68,060.  However, HHS announced several months later that, due to changes in the CDC's masking guidance, HHS would not monitor grantees for compliance with the masking requirement.  *See* Office of Head Start, *HHS, CDC Community Levels Recommendations and Mask Wearing*.[6]  On

---

[6] https://perma.cc/Y5YS-D3CC

January 6, 2023, the Secretary issued a final rule that (as relevant here) eliminated the masking requirement. *See Mitigating the Spread of COVID–19 in Head Start Programs*, 88 Fed. Reg. 993 (Jan. 6, 2023).[7]

"Mootness is one of the doctrines that ensures federal courts are only deciding live cases or controversies." *Spell v. Edwards*, 962 F.3d 175, 178-79 (5th Cir. 2020). "[A] case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed." *Id.* at 179. Indeed, "mootness is the default" in this situation. *Freedom from Religion Found., Inc. v. Abbott*, 58 F.4th 824, 832 (5th Cir. 2023). "Once the law is off the books, there is nothing injuring the plaintiff and, consequently, nothing for the court to do." *Spell*, 962 F.3d at 179.

The final rule's rescission of the masking requirement thus rendered the challenge to that requirement moot. Although "a defendant cannot automatically moot a case simply by ending its [allegedly] unlawful conduct once sued," the Secretary's rescission of the IFR's masking requirement was not "mere litigation posturing." *Spell*, 962 F.3d at 179 (quotation marks omitted); *accord Freedom from Religion Found.*, 58 F.4th at 833 ("[W]ithout evidence to the contrary, we assume that formally announced changes to

---

[7] The final rule did not affect the IFR's vaccination requirement, which remains under review. *See* 88 Fed. Reg. at 993.

official governmental policy are not mere litigation posturing." (quoting

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009)).  On

the contrary, the IFR itself contemplated that the standards it put in place for

Head Start grantees would be reevaluated in light of comments received on

the IFR.  *See, e.g.*, 86 Fed. Reg. at 68,052 (promulgating an "Interim final rule

with comment period"); 88 Fed. Reg. at 993 (noting that the agency had

received over 1,700 public comments on masking during the comment

period).  In *Missouri*, the Supreme Court concluded that a similar "deferred

notice-and-comment period" on the IFR at issue in that case was

"permissible."  *Missouri*, 142 S. Ct. at 654.  And an interim final rule's

requirement terminates when it is rescinded or replaced by a final rule.

Accordingly, the district court's judgment should be vacated as moot to

the extent that it addressed the IFR's masking requirement.  *See United States

v. Munsingwear*, 340 U.S. 36, 39 (1950).

### B.    The Masking Requirement Was Within the Secretary's Statutory Authority.

Alternatively, assuming the Court reaches the merits, the Court should

vacate the permanent injunction because the masking requirement fell easily

within the Secretary's authority to set standards for Head Start grantees.  As

explained above, the Secretary has statutory authority to set standards that

29

require Head Start grantees to prevent the spread of communicable disease within their programs.  Such requirements have long been directed to Head Start personnel as well as participants.

For example, in addition to the standards discussed above, unchallenged standards have required that "[n]onporous (e.g., latex) gloves must be worn by staff when they are in contact with spills of blood or other visibly bloody bodily fluids."  61 Fed. Reg. at 57,215 (45 C.F.R. § 1304.22(e)(3) (1997)).  Such standards also have required that "[s]taff, volunteers, and children must wash their hands with soap and running water" in specified circumstances including after diapering or toilet use, before food preparation, and whenever hands are contaminated with blood or other bodily fluids.  *Id.* (45 C.F.R. § 1304.22(e)(1) (1997)); *see also id.* (45 C.F.R. § 1304.22(e)(2) (1997) (further requiring staff and volunteers to wash their hands before and after administering medication or treating or bandaging a wound).  More generally, the 2016 standards, which remain in effect, require that "[a]ll staff systematically and routinely implement hygiene practices" for "[a]ppropriate toileting, hand washing, and diapering procedures"; "[s]afe food preparation"; and to ensure that "[e]xposure to blood and body fluids are handled consistent with standards of the Occupational Safety Health Administration."  81 Fed. Reg. at 61,427 (45 C.F.R. § 1302.47(b)(6)).

30

Just as the Secretary could require Head Start personnel to wear gloves to prevent the spread of disease to the children in their care, the Secretary could require Head Start personnel to wear masks to prevent the spread of the virus that causes COVID-19. Masking is a conventional means to prevent the spread of communicable disease. Accordingly, "doctors have been wearing medical-grade N95 or surgical masks . . . during surgeries or patient interactions as part of their daily routines, for many decades." Yale Med., *Why Doctors Wear Masks* (Sept. 1, 2020), https://perma.cc/9W9J-6F3U. And "the United States . . . led the world in mask wearing" to prevent the spread of the 1918 flu pandemic. Paul French, *In the 1918 Flu Pandemic, Not Wearing a Mask Was Illegal in Some Parts of America. What Changed?*, CNN, https://perma.cc/7UKE-4S9Y (last updated Apr. 4, 2020).

The district court gave little explanation for its permanent injunction against the IFR's masking requirement. The district court declared that "[t]here is nothing in 42 U.S.C. § 9836a which would allow" the Secretary "to require two (2), three (3), and four (4), year-old students to wear masks the majority of the day." *Louisiana*, 2022 WL 4370448, at *10. On its face, that pronouncement does not explain why the court enjoined the masking requirement as applied to Head Start staff and volunteers, who have long been

31

required to wear protective equipment (gloves) as a means to prevent the spread of disease to the children in their care.

The district court's reasoning also fails on its own terms because the Secretary can set standards to prevent participating children from spreading disease within the Head Start programs. As discussed above, grantees have long been required to "exclude children who have short-term acute conditions that are contagious and pose an immediate risk to others in Early Head Start and Head Start settings." 61 Fed. Reg. at 57,196. Moreover, the Secretary's unchallenged standards generally prevent children from enrolling in a Head Start program unless they have been immunized in accordance with state requirements. *See* 81 Fed. Reg. at 61,417 (45 C.F.R. § 1302.15(e)). Clearly, the Secretary could impose the more modest requirement that participating children—most of whom were too young to be vaccinated against COVID-19— wear masks to protect other participating children and their families from a deadly airborne virus.

### III. Any Relief Should Be Limited To Plaintiff Sandy Brick And Any Head Start Grantees That Are Arms Of The Plaintiff States And Established Standing.

For the reasons set out above, there is no basis to affirm the permanent injunction as to any plaintiff. But assuming this Court reaches a contrary conclusion, any relief should be limited to plaintiff Sandy Brick—a staff

member at a Head Start center in Kinder, Louisiana, who objected to the IFR's vaccination requirement only, *see* ROA.24098-24100 (Brick Declaration)—and to any Head Start grantee that is an arm of a plaintiff State and objected to the IFR's requirements, *see, e.g.*, ROA.23959-60 ¶ 7 (representing that Southern Utah University is both a Head Start grantee and a state entity); ROA.210-216 (declaration of a representative of the Southern Utah University Head Start, objecting to the IFR's requirements).

The principles that govern the scope of a permanent injunction are well settled and were recently reiterated by the Sixth Circuit in *Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022), which narrowed a permanent injunction so as to eliminate relief for a State that failed to demonstrate standing. *See id.* at 341 n.12 (rejecting Kentucky's assertion that its challenge to a federal grant condition "is justiciable if we determine that *Tennessee's* challenge to" the same federal grant condition "is justiciable"). As the Sixth Circuit explained, "[s]tanding is not dispensed in gross." *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6, (1996)). "Rather, to win summary judgment and obtain injunctive relief," each State "had to demonstrate, with evidence, why it was suffering *particularized* continuing or imminent injuries in fact." *Id.* "Thus, the district court had no authority to issue an injunction protecting a party that failed to

33

demonstrate that its challenge was even justiciable." *Id.* "Instead, a 'remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" *Id.* (quoting *DaimerChrysler Corp.*, 547 U.S. at 353).

Furthermore, a permanent injunction is an equitable remedy that "does not follow from success on the merits as a matter of course." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Accordingly, "balance of equities and consideration of the public interest" are "pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Id.* A district court abuses its discretion if it issues injunctive relief that "is not narrowly tailored to remedy the specific action which gives rise to the order as determined by the substantive law at issue." *ODonnell v. Harris County*, 892 F.3d 147, 155 (5th Cir. 2018) (quotation marks omitted), *overruled on other grounds by Daves v. Dallas County*, 22 F.4th 522 (5th Cir. 2022) (en banc).

The district court failed to adhere to these important limits on the scope of the judicial power when it permanently enjoined enforcement of the IFR's requirements against any Head Start grantee located within any of the 24 plaintiff States. For example, the district court observed that "Louisiana R.S. § 17:170 allows Louisiana students in schools and colleges to opt out of the required vaccines by a written dissent" and declared that the IFR "also preempts the laws of other states with similar statutes." *Louisiana*, 2022 WL

34

4370448, at *5.  Even as to Louisiana, the district court's observation did not demonstrate standing because the IFR did not require students enrolled in Head Start to be vaccinated against COVID-19.  (On the contrary, the IFR explained that most of the children enrolled in Head Start were too young to receive a COVID-19 vaccination.)  More generally, even if Louisiana had demonstrated standing to challenge the IFR, such a showing would not allow the district court to grant relief to other plaintiff States.  As the Sixth Circuit correctly recognized when it narrowed the scope of a permanent injunction, "to win summary judgment and obtain injunctive relief," "each [State] had to demonstrate, with evidence, why it was suffering *particularized* continuing or imminent injuries in fact."  *Kentucky*, 54 F.4th at 341 n.12.

The district court further declared that "[t]he Plaintiff States also have individual standing and injury based upon"

> the alleged loss of jobs, businesses, tax revenue, unemployment benefits, reliance interest by Plaintiff States in the Head Start program, and other damages allegedly resulting from employees being fired for refusing the vaccine, and/or providers being terminated.

*Louisiana*, 2022 WL 4370448, at *6.  There are multiple problems with that reasoning.  First, alleged injuries are insufficient to obtain a permanent injunction; such injuries must be shown "with evidence."  *Kentucky*, 54 F.4th at 341 n.12 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Second, the district court's reasoning rested on predictions about the actions of third parties that the Supreme Court in *California v. Texas*, 141 S. Ct. 2104 (2021), found too attenuated to establish state standing to challenge a federal requirement. *See id*. at 2116-20 (holding that the evidence submitted by the plaintiff States failed to demonstrate standing to challenge the Affordable Care Act's minimum essential coverage provision). For example, in the Statement of Material Facts that the plaintiff States submitted in support of their summary judgment motion, they predicted that as the result of the IFR, "staff and volunteers will likely leave the Head Start program, certain providers will close, and low-income children in affected areas will be denied access" to Head Start programs; that "some parents would remove their children from Head Start programs"; that "[w]idespread closure of Head Start programs would harm the health and well-being of each State's residents"; and that the IFR "may cause Plaintiff States to lose direct federal funding or cause public schools to lose federal funding." ROA.23962 ¶¶ 20-23. Each step in that chain of inferences was speculative and ignored the IFR's countervailing effects, such as its impact on the parents who preferred to have their children protected from exposure to COVID-19; its impact on the staff who preferred not to be exposed to unnecessary risk from unvaccinated and unmasked co-

workers; and the fact that COVID-19 infections had caused widespread closures of Head Start programs in the period before the IFR was issued.

Moreover, plaintiffs' submission stated only that the IFR "may" cause them to lose federal funding, ROA.23962 ¶ 23, and identified only two Head Start grantees that plaintiffs claimed were state entities subject to the IFR, *see* ROA.23059-23960 (claiming that the Southern Utah University grantee and the Georgia Department of Early Care and Learning received federal grants that made them subject to the IFR). Even assuming that those two grantees had demonstrated standing to seek a permanent injunction, there was no basis for the district court to enjoin enforcement of the IFR against *every* Head Start grantee located within the 24 plaintiff States.

At bottom, the district court appears to have been confused about the limits on when States have *parens patriae* standing to sue on behalf of state residents. In an action against private entities—such as the apple growers in *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982)—a State generally has *parens patriae* standing. But as the Supreme Court's decision in *California v. Texas* illustrates, that theory of standing is unavailable when a State sues the federal government. As this Court recently recognized, "'[a] State [does not] have standing as the parent of its citizens . . . against the Federal Government, the ultimate parens patriae of every American citizen.'"

37

*Brackeen v. Haaland*, 994 F.3d 249, 292 n.13 (5th Cir. 2021) (en banc) (per

curiam) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966))),

*cert. granted*, 142 S. Ct. 1205 (2022) (mem.); *see also Massachusetts v. Mellon*,

262 U.S. 447, 485–86 (1923) (rejecting the argument that "a state, as parens

patriae, may institute judicial proceedings to protect citizens of the United

States from the operation of the statutes thereof" and explaining that "it is no

part of [a State's] duty or power to enforce" the rights of its citizens "in

respect of their relations with the federal government").

Contrary to the district court's suggestion, "special solicitude" for States

is not a substitute for concrete injury. *Louisiana*, 2022 WL 4370448, at *6.

Moreover, such solicitude applies only in limited circumstances that are not

implicated here.  In the cases on which the district court relied, the plaintiff

States demonstrated that the challenged agency action threatened state

territory, *see Massachusetts v. EPA*, 549 U.S. 497, 498 (2007), or the state fisc,

*see Texas v. United States*, 809 F.3d 134, 152-53 (5th Cir. 2015).  For example,

in the *Texas* case, this Court concluded that the Deferred Action for Parents of

Americans and Lawful Permanent Residents program (DAPA) "would have a

major effect on the states' fiscs, causing millions of dollars of losses in Texas

alone," and that "at least in Texas, the causal chain is especially direct because

DAPA would enable beneficiaries to apply for driver's licenses, and many

38

would do so, resulting in Texas's injury." *Id.* And in *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022), this Court reasoned that "[t]he importance of immigration policy and its consequences to Texas, coupled with the restraints on Texas' power to make it, create a quasi-sovereign interest" that allowed the State to challenge the Deferred Action for Childhood Arrivals program. That reasoning has no application to Head Start, which is a federal grant program and, moreover, one that affects only a tiny fraction of children under age 6. *See supra*, p. 26 & n.5.

Finally, the district court erred in ruling that the balance of equities and the public interest justified the permanent injunction. The district court declared that "[t]he public has a liberty interest in not being required to take a vaccine or be fired from their jobs" and that, "[a]lthough vaccines arguably serve the public interest, the liberty interests of individuals mandated to take the COVID-19 vaccine outweigh any interest generated by the mandatory administration of vaccines." *Louisiana*, 2022 WL 4370448, at *614. That cursory analysis disregarded the vital interests that the IFR advanced: protecting the children enrolled in Head Start from a dangerous and highly contagious disease and reducing the repeated and unpredictable closures of Head Start operations that COVID-19 infections had caused, which denied these low-income children and their families the services that this federal

39

grant program is meant to provide. Given the scant evidence of countervailing harms—Sandy Brick being the sole individual who asserted a liberty interest in working unvaccinated for a federally funded Head Start center—the injunction was an abuse of the district court's discretion.

## CONCLUSION

The judgment of the district court should be reversed and the permanent injunction vacated.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
    *General*

BRANDON BONAPARTE BROWN
   *United States Attorney*

 *s/ Alisa B. Klein*
ALISA B. KLEIN
SARAH CLARK
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7235*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-1597*
   *alisa.klein@usdoj.gov*

March 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Alisa B. Klein*
Alisa B. Klein

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8630 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*s/ Alisa B. Klein*

Alisa B. Klein