No. 22-30748

# In the United States Court of Appeals for the Fifth Circuit

STATE OF LOUISIANA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF INDIANA; STATE OF IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF WYOMING; SANDY BRICK,

*Plaintiffs – Appellees*,

v.

XAVIER BECERRA, in his official capacity as Secretary of Health & Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ADMINISTRATION FOR CHILDREN & FAMILIES; JOOYEUN CHANG, in her official capacity as Principal Deputy Assistant for Children & Families; BERNADINE FUTRELL, in her official capacity as the director of the Office of Head Start; JOSEPH R. BIDEN, JR.; OFFICE OF HEAD START,

*Defendants – Appellants*.

*On Appeal from the United States District Court
for the Western District of Louisiana*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
J. Alexander Rowell
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org
*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation.  In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: March 10, 2023                    */s/ Brianne J. Gorod*
                                          Brianne J. Gorod

                                          *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ................ i

CORPORATE DISCLOSURE STATEMENT .................................................. ii

TABLE OF CONTENTS ........................................................................... iii

TABLE OF AUTHORITIES ....................................................................... iv

INTEREST OF *AMICUS CURIAE* .................................................... 1

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................ 4

I. The Major Questions Doctrine Applies Only in "Extraordinary" Cases, Where an Agency's Breathtaking Assertion of Power Reflects a Dubious Effort to Transform the Fundamental Nature of Its Authority ............................................................................. 4

II. The Head Start Rule at Issue Is Far From "Extraordinary" ............... 13

    A. Economic and Political Significance ............................................ 13

    B. Fundamental Transformations of Power Unlikely to Be Authorized by Congress .................................................. 15

III. Extending the Major Questions Doctrine to Cases Like This Would Undermine Traditional Statutory Interpretation and Constitutional Principles ............................................................................. 21

    A. Textualism ...................................................................... 21

    B. Original Meaning ............................................................. 23

    C. Separation of Powers ....................................................... 26

CONCLUSION .............................................................................. 29

CERTIFICATE OF SERVICE ......................................................... 1A

CERTIFICATE OF COMPLIANCE ................................................. 2A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Ala. Ass'n of Realtors v. HHS*,
    141 S. Ct. 2485 (2021) ........................................................... 10

*Biden v. Missouri*,
    142 S. Ct. 647 (2022) ......................................................... *passim*

*Bostock v. Clayton Cnty*,
    140 S. Ct. 1731 (2020) ....................................................... 21, 22

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ................................................................. 5

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .......................................................... *passim*

*FTC v. Bunte Bros., Inc.*,
    312 U.S. 349 (1941) ............................................................... 17

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ............................................................. 9, 20

*Industrial Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) ............................................................. 5, 16

*King v. Burwell*,
    576 U.S. 473 (2015) ......................................................... 9, 10, 20

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ........................................................... 20

*Little Sisters of the Poor v. Pennsylvania*,
    140 S. Ct. 2367 (2020) ........................................................... 22

*Livingston Educ. Serv. Agency v. Becerra*,
    35 F.4th 489 (6th Cir. 2022) .................................................. 3, 17

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Louisiana v. Becerra,*
  No. 3:21-CV-04370, 2022 WL 4370448
  (W.D. La. Sept. 21, 2022).................................................................. 13, 16, 22

*The Margaretta,*
  16 F. Cas. 719 (C.C.C. Mass 1815).................................................... 25

*Massachusetts v. EPA,*
  549 U.S. 497 (2007)........................................................................... 8, 22

*MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.,*
  512 U.S. 218 (1994)........................................................................... *passim*

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
  142 S. Ct. 661.................................................................................... 10, 11, 14, 16

*New Prime Inc. v. Oliveira,*
  139 S. Ct. 532 (2019)......................................................................... 27

*Pension Benefit Guar. Corp. v. LTV Corp.,*
  496 U.S. 633 (1990)........................................................................... 21

*Utility Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014)........................................................................... *passim*

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022)....................................................................... *passim*

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001)........................................................................... 7

*Wisconsin Cent. Ltd. v. United States,*
  138 S. Ct. 2067 (2018)....................................................................... 21

LEGISLATIVE MATERIALS

Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109 ......................................... 25

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Act of May 26, 1790, ch. 12, § 1, 1 Stat. 122 .......................................... 25

Act of July 22, 1790, ch. 33, § 1, 1 Stat. 137........................................... 24

Act of Aug. 4, 1790, ch. 34, § 2, 1 Stat. 138 .......................................... 24

40 Fed. Reg. 27,562 (June 30, 1975) ....................................................... 17

61 Fed. Reg. 57,210 (Nov. 5, 1996).......................................................... 17

86 Fed. Reg. 68,052 (Nov. 30, 2021)........................................................ 18

5 U.S.C. § 801 .......................................................................................... 28

5 U.S.C. § 804 .......................................................................................... 28

42 U.S.C. § 9831 ...................................................................................... 18

42 U.S.C. § 9836a .................................................................................... 18

## OTHER AUTHORITIES

Kevin Arlyck, *Delegation, Administration, and Improvisation*, 96
    Notre Dame L. Rev. 243 (2021) ........................................................ 25

Natasha Brunstein & Donald L. R. Goodson, *Unheralded and
    Transformative: The Test for Major Questions After* West Virginia,
    47 Wm. & Mary Env't L. & Pol'y Rev. 47 (2022)............................. 16

Christine Kexel Chabot, *The Lost History of Delegation at the
    Founding*, 56 Ga. L. Rev. 81 (2021).................................................. 24

Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Envtl. L. J.
    379 (2021) ......................................................................................... 27

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev.
    2118 (2016) ....................................................................................... 27, 28

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387
(2003) ................................................................................ 22

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the
Founding*, 121 Colum. L. Rev. 277 (2021)........................................ 24

Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case
Against Administrative Regulatory Power: New Evidence from the
Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288
(2021) ................................................................................ 25

Nathan Richardson, *Antideference: COVID, Climate, and the Rise of
the Major Questions Canon*, 108 Va. L. Rev. Online 174 (2022)...... 26

Mila Sohoni, *The Major Questions Quartet,* 136 Harv. L. Rev. 262
(2022) ................................................................................ 22, 26

Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty
(Sept. 6, 2022) ..................................................................... 22, 28

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works to improve understanding of the Constitution and preserve the rights and freedoms it guarantees.

In furtherance of those goals, CAC has studied the rich history of legislative delegations to agencies, the development of the major questions doctrine, and its effects on the separation of powers. CAC accordingly has a unique interest in this case and is well situated to discuss the proper interpretation of the Supreme Court's decision in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).

## INTRODUCTION

In recent years, the Supreme Court has concluded in several cases that agencies were making novel assertions of transformative regulatory authority despite indications that Congress had not meant to grant that power. Taking stock of this case law, *West Virginia v. EPA* explicitly formulated a "major questions doctrine," explaining that "precedent teaches that there are 'extraordinary cases' that call for a different approach" from "routine statutory interpretation." 142 S. Ct.

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. Plaintiffs-Appellees and Defendants-Appellants have consented to the filing of this brief.

2587, 2608-09 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)).  In these extraordinary cases, courts do not simply analyze a law's text as usual but instead require agencies to show "clear congressional authorization" for their actions.  *Id.* at 2609 (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

As made clear by *West Virginia* and the precedent on which it relied, the "economic and political significance" of an agency decision is not sufficient to render a case "extraordinary."  *Id.* at 2608 (quoting *Brown & Williamson*, 529 U.S. at 159-60).  Instead, the "history and the breadth of the authority that the agency has asserted" must also indicate that the agency is seeking to fundamentally transform its power "beyond what Congress could reasonably be understood to have granted." *Id.* at 2608-09 (brackets omitted).  To determine whether this second requirement is met, the Supreme Court has focused primarily on whether agencies are seeking "unheralded power" by twisting the "vague language" of "ancillary" provisions to "make a radical or fundamental change to a statutory scheme."  *Id*. at 2609-10 (internal quotations omitted).  An agency's claimed authority must be more than "unprecedented," it must represent a "'fundamental revision of the statute, changing it from one sort of scheme of . . . regulation' into an entirely different kind."  *Id.* at 2612 (quoting *MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218, 231 (1994) (brackets omitted)).

That is not the case here.  HHS—an agency with "a history of regulating the health of Head Start staff in order to protect the children in the program," *Livingston Educ. Serv. Agency v. Becerra*, 35 F.4th 489, 492 (6th Cir. 2022)—is not using an "obscure, never-used section of the law" to assert a fundamentally new type of authority.  *West Virginia*, 142 S. Ct. at 2602 (internal quotation omitted).  Instead, through its Secretary, it is using the same broad grant of authority that it has routinely used for decades to set program standards that protect the health and safety of the children who receive Head Start services.  As the Supreme Court has recognized, merely going "further than what the Secretary has done in the past to implement infection control" in response to "an infection problem of this scale and scope" does not trigger the major questions doctrine.  *Biden v. Missouri*, 142 S. Ct. 647, 653 (2022) (per curiam).

Applying the major questions doctrine too broadly, as the court below did, would unduly expand the situations in which a statute's best reading is subordinated to non-textual considerations like the perceived consequences of an agency decision.  It would also be in serious tension with the original understanding of the Constitution.  Since the Founding, Congress has used broad language to grant the executive branch vast discretion over highly consequential decisions, and history does not suggest that Congress must speak in any particular fashion to assign such authority.  Finally, overuse of the major questions doctrine would thrust the courts

beyond their role interpreting the law, shifting their focus instead toward subjective assessments about pragmatic and political matters over which judges lack relative expertise.

These considerations all provide further reason to heed the Supreme Court's guidance and reserve the major questions doctrine for "extraordinary" cases in which agencies attempt dubious and spectacular transformations of their longstanding authority. In those situations, "a practical understanding of legislative intent" calls for judicial wariness. *West Virginia*, 142 S. Ct. at 2609. But here, where such radical and counterintuitive innovation is absent, refusing to give effect to the plain words of the Head Start Act would unjustifiably interfere with the congressional design plainly embodied in its text.

## ARGUMENT

### I. The Major Questions Doctrine Applies Only in "Extraordinary" Cases, Where an Agency's Breathtaking Assertion of Power Reflects a Dubious Effort to Transform the Fundamental Nature of Its Authority

What is now known as the "major questions doctrine" emerged gradually in recent years, beginning as an aid to traditional statutory interpretation before transforming into a requirement of "clear congressional authorization" in "certain extraordinary cases." *West Virginia*, 142 S. Ct. at 2609 (internal quotations omitted). But while the doctrine has evolved, one thing has remained constant: the economic and political significance of an agency's action is not alone sufficient to trigger its

application.  Instead, other factors must indicate that the agency is subverting congressional intent by seeking "an unheralded power representing a transformative expansion in its regulatory authority." *Id.* at 2610 (internal quotations omitted).

The Supreme Court initially invoked the presumption that Congress speaks clearly when assigning authority over major questions only as additional support for conclusions reached through ordinary statutory interpretation.  For example, the opinion containing the first glimmers of the doctrine, *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) (plurality opinion), squarely rested its statutory construction on "language and structure" and "legislative history." *Id.* at 641.  As further support, the opinion also noted that it would be unreasonable without a "clear mandate" to read the statute as permitting "the unprecedented power over American industry" claimed by the agency, given that this interpretation would confer broad new authority to regulate "thousands of substances used in the workplace." *Id.* at 645.

After the Supreme Court decided *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), it occasionally used major questions analysis to buttress its determination that a statute's plain meaning precluded judicial deference to agency interpretations.  In doing so, the Court continued to demand more than significant economic and political consequences; it also asked whether the agency sought to overhaul the basic nature of its authority.  For example, in *MCI*

*v. AT&T*, 512 U.S. 218 (1994), the Court rejected an agency's claim that its power to "modify" certain statutory requirements allowed it to completely exempt a large swath of industry from those requirements. *Id.* at 223-24. Because that word "connotes moderate change" and the particular statutory context showed it was not intended to authorize "fundamental changes," this "subtle device" did not empower the agency to exclude "40% of a major sector" from obligations of "enormous importance to the statutory scheme." *Id.* at 228-31. In other words, the agency could not use this ancillary provision to effect a "fundamental revision of the statute." *Id.* at 231.

The same concerns animated a key case in the doctrine's development, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). After decades of claiming it lacked authority to regulate tobacco, the FDA reversed course, issuing regulations to reduce youth smoking. *Id.* at 125. Examining the statute "as a whole," the Court concluded that "there is no room for tobacco products within the [FDA's] regulatory scheme," because other provisions would require the FDA to ban tobacco entirely if it fell within the agency's jurisdiction. *Id.* at 142-43.

Only then did the Court turn briefly to major questions considerations while discussing why it would not defer to the agency's interpretation. In "extraordinary cases," the Court wrote, "there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 159. Explaining why this

was such a case, the Court emphasized the FDA's novel assertion of jurisdiction over an entire industry that previously fell outside its ambit, contrary to longstanding agency representations. *Id.* The Court further highlighted the agency's "extremely strained understanding of . . . a concept central to [its] regulatory scheme," the existence of "a distinct regulatory scheme for tobacco products," and repeated congressional actions "to preclude any agency from exercising significant policymaking authority in [this] area." *Id.* at 159-60. "Given this history and the breadth of the authority that the FDA has asserted," the Court concluded that "Congress could not have intended to delegate a decision of such economic and political significance" in "so cryptic a fashion." *Id.* at 160. The key point was the FDA's unpersuasive attempt to rewrite the boundaries of its regulatory authority.

The Court rejected a similar attempt in *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001), this time by litigants who claimed that the EPA must consider compliance costs when setting air quality standards. Disagreeing, the Court held that the statute "unambiguously bars cost considerations." *Id.* at 471. It rejected the argument that certain "modest words" in the statute authorized cost considerations, because Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions" or "hide elephants in mouseholes." *Id.* at 468 (citing *MCI*, 512 U.S. at 231; *Brown & Williamson*, 529

U.S. at 159-60). Once again, the focus was on preventing dubious transformations of regulatory regimes, not on the breadth of an agency's asserted power in isolation.

Confirming that point, *Massachusetts v. EPA*, 549 U.S. 497 (2007), emphasized the proper focus and narrow reach of the doctrine. There, the EPA justified its denial of a rulemaking petition to establish limits on vehicle greenhouse gas emissions by claiming that such limits "would have even greater economic and political repercussions than regulating tobacco." *Id.* at 512. The Court rejected this comparison to *Brown & Williamson*, explaining that while it was "unlikely that Congress meant to ban tobacco products," there was "nothing counterintuitive" about the EPA regulating greenhouse gas emissions. *Id.* at 530-31. In other words, because conflict "with the Agency's pre-existing mandate" was not apparent, the Court would not "read ambiguity into a clear statute" simply because agency action would have significant consequences. *Id.*

In *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014), the Court began using major questions analysis when assessing the reasonableness of agencies' statutory interpretations. As before, the focus remained on whether an agency sought to transform its regulatory reach through improbable new interpretations. In this case, the EPA interpreted certain permit provisions to apply to stationary sources of greenhouse gas emissions, even though that interpretation would have swept millions of additional sources into the agency's purview. Admitting that its

interpretation "would overthrow" the statute's "structure and design," the EPA tried to alleviate this result by changing statutorily prescribed emission thresholds to exempt many of those sources. *Id.* at 321-22. This obvious conflict with the statute made the EPA's approach unreasonable, "an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization." *Id.* at 324. Thus, here too, the Court was concerned with an agency's "discover[y]" of an "unheralded power" in a "long-extant statute." *Id.*; *see id.* (the EPA was "seizing expansive power that it admit[ted] the statute [was] not designed to grant").

Other major questions cases underscore that a closer look is appropriate when agencies regulate new topics outside their areas of expertise. In *Gonzales v. Oregon*, 546 U.S. 243 (2006), the Court held invalid an Attorney General-issued rule barring the provision of drugs for assisted suicide. To bolster its conclusion that *Chevron* was inapplicable because the rule exceeded the Attorney General's regulatory authority, the Court observed that Congress would not grant "broad and unusual authority" to alter a regulatory scheme's "fundamental details" through "vague terms or ancillary provisions." *Id.* at 259-61, 267 (internal quotations omitted). And in *King v. Burwell*, 576 U.S. 473 (2015), the Court did not defer to the IRS's interpretation of a law on health insurance tax credits, citing their importance to the statute's key reforms, their cost and scope, and the agency's lack of "expertise in crafting health insurance policy." *Id.* at 486. But the Court nonetheless upheld the

IRS's politically and economically significant rule as the best reading of the statute. The Court pointedly rejected the challengers' reliance "on the ultimate ancillary provision: a sub-sub-sub section of the Tax Code." *Id.* at 497.

More recently, the Court's pandemic-era cases again underscore that more is required to trigger the major questions doctrine than vast economic and political significance. First, the Court ruled against an eviction moratorium issued pursuant to the CDC's authority "to prevent the introduction, transmission, or spread" of diseases. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2487 (2021) (per curiam). Because the statute "illustrat[ed] the kinds of measures" it encompassed by listing examples, all directly tied to the spread of disease, the "far more indirect[]" eviction ban was unauthorized. *Id.* at 2488. And "[e]ven if the text were ambiguous, the sheer scope of the CDC's claimed authority … would counsel against the Government's interpretation." *Id.* at 2489. This assessment hinged on more than financial costs or geographic reach alone: the "unprecedented" nature of the moratorium and the CDC's identification of virtually "no limit" to its claimed power were essential to the Court's conclusion that Congress did not likely grant this "breathtaking amount of authority." *Id.*

Similarly, when applying the doctrine to rule against OSHA's vaccination-or-testing mandate for large employers in *National Federation of Independent Business v. OSHA*, 142 S. Ct. 661 (2022) (per curiam), the Court discussed and relied on a

variety of factors beyond the mandate's "significant encroachment into the lives—and health—of a vast number of employees." *Id.* at 665. These factors included the poor fit between OSHA's "sphere of expertise" in "workplace safety standards" and what resembled "a general public health measure," the conspicuous novelty of the mandate, and signs that Congress believed OSHA lacked this power. *Id.* at 665-66. At bottom, the Court concluded, the mandate was "simply not part of what the agency was built for." *Id.* at 665 (internal quotations omitted).

Significantly, that same day the Court did not apply the major questions doctrine to an HHS mandate that staff at medical facilities receiving Medicare or Medicaid funds be vaccinated against COVID. *Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam). Dissenting justices highlighted the rule's economic and political significance, but "put[ting] more than 10 million healthcare workers to the choice of their jobs or an irreversible medical treatment," *id.* at 660 (Alito, J., dissenting), was not enough for the Court to invoke the doctrine. The majority concluded that in view of the agency's "longstanding practice," the mandate was not "surprising," but rather was among the "routinely impose[d]" funding conditions relating to healthcare workers' responsibilities. *Id.* at 652-53. And unlike in *NFIB*, the Court found no mismatch with agency expertise: "addressing infection problems in Medicare and Medicaid facilities is what [the HHS Secretary] does." *Id.* at 653. The lesson: where agency action "fits neatly within the language of the statute," the

major questions doctrine does not constrain the statute's "seemingly broad language." *Id.* at 652.

Finally, *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), announced the "major questions doctrine" as such and outlined its requirements. In "extraordinary cases," the Court explained, both "the history and the breadth of the authority that [the agency] has asserted, *and* the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *Id.* at 2608 (emphasis added) (internal quotations omitted).

*West Virginia* elaborated on the factors beyond economic and political significance that may indicate an agency is seeking to transform its authority in a way Congress did not likely intend. It cautioned against reading "modest words," "vague terms," "subtle device[s]," or "oblique or elliptical language" as providing "extraordinary grants of . . . authority" to make a "radical or fundamental change to a statutory scheme." *Id.* at 2609 (internal quotations omitted). Applying the factors distilled from past major questions cases, the Court described the EPA as attempting a "transformative expansion in [its] regulatory authority" by asserting an "unheralded" power that changed the relevant statutory scheme "into an entirely different kind." *Id.* at 2610, 2612 (internal quotations omitted). The agency's novel approach relied on the "vague language of an ancillary provision[]," it required expertise not traditionally held by the agency, and Congress had "conspicuously and

repeatedly declined to enact" such a regulatory scheme. *Id.* at 2610, 2612-13 (internal quotations omitted).

## II. The Head Start Rule at Issue Is Far From "Extraordinary"

In determining whether a case involves a major question, the issue is not merely whether an agency is asserting "highly consequential power," but whether that power is "beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. While "vast economic and political significance" is necessary, it is not sufficient; the "history and the breadth" of the power asserted must also show that the agency is seeking a "transformative expansion in [its] regulatory authority" through a "radical or fundamental change to [the] statutory scheme." *Id.* at 2605, 2608-10 (internal quotations omitted). To identify such dubious transformations, the Court looks to several factors, focusing in particular on eyebrow-raising novelty, conflict with the overall regulatory scheme, and reliance on vague, ancillary provisions. Unlike in *West Virginia* and prior major questions cases, those features are absent here.

### A. Economic and Political Significance

According to the court below, the major questions doctrine applies whenever an agency makes a decision of "vast economic and political significance." *Louisiana v. Becerra*, No. 3:21-CV-04370, 2022 WL 4370448, at *11 (W.D. La. Sept. 21, 2022). This is wrong. As *West Virginia* and prior cases make clear, economic and

political significance alone is insufficient to render a case so "extraordinary" as to merit application of the major questions doctrine. *See West Virginia*, 142 S. Ct. 2610-14 (relying also on "unheralded" and "transformative" use of "ancillary provision[s]"); *Missouri*, 142 S. Ct. at 652 (emphasizing that where action "fits neatly within the language of the statute," the doctrine does not constrain the statute's "seemingly broad language," notwithstanding significant consequences); *Utility Air*, 573 U.S. at 324 (also noting "unheralded" and "transformative" nature of power that agency "admits the statute is not designed to grant"); *Brown & Williamson*, 529 U.S. at 160 (also noting "history and breadth" of authority and "Congress' consistent judgment to deny the [agency] this power").

But even if economic and political significance alone could trigger the doctrine, it would nevertheless not apply here, given that the rule affects only Head Start staff, children, and volunteers. *See* Appellant Br. 26. This targeted requirement is a far cry from OSHA's major-question-triggering "broad public health measure[]" that "ordered 84 million Americans" to receive a COVID vaccine or test weekly. *NFIB*, 142 S. Ct. at 665. As discussed above, the Supreme Court refused to apply the major questions doctrine to a much broader HHS mandate compelling vaccination for "over 10,000,000 healthcare workers." *Missouri*, 142 S. Ct. at 659 (Alito, J., dissenting). And Head Start serves less than four percent of children aged five and under, *see* Appellant Br. 26 & n.5, making this rule quite distinct from *MCI*'s

challenged rule erasing statutory requirements for "40% of a major sector," 512 U.S. at 231.

Moreover, when identifying actions with vast economic and political significance, the Court has focused more on the number of entities newly swept into regulatory schemes than on new costs imposed on already-regulated entities. *See Utility Air*, 573 U.S. at 332 (upholding greenhouse gas rules where "[w]e are not talking about extending EPA jurisdiction over millions of previously unregulated entities, but about moderately increasing the demands EPA . . . can make of entities already subject to its regulation"); *Brown & Williamson*, 529 U.S. at 159 (rejecting new assertion of jurisdiction over "an industry constituting a significant portion of the American economy"). But there is no private industry to analyze here, much less a newly regulated one: HHS has issued performance standards for grantees to reduce the spread of communicable diseases for decades.

### B. *Fundamental Transformations of Power Unlikely to Be Authorized by Congress*

In considering the doctrine's second requirement that an agency has fundamentally transformed its authority in a manner "very unlikely" to have been authorized by Congress, *West Virginia*, 142 S. Ct. at 2609, the Supreme Court looks

for several potential indicators that such a transformation is afoot—none of which are present in this case.[2]

### 1. *Novel uses of agency power*

The Supreme Court has repeatedly expressed skepticism about "unprecedented" claims of authority, *West Virginia,* 142 S. Ct. at 2612 (quoting *Industrial Union*, 448 U.S. at 645), in which agencies purport to find "unheralded power[s]" in "long-extant statute[s]," *id.* at 2610 (quoting *Utility Air*, 573 U.S. at 324).

Importantly, though, the Court considers novelty at a high level of generality. When an agency takes action "strikingly unlike" its past efforts, this can weigh in favor of the doctrine's application. *NFIB*, 142 S. Ct. at 665. But the same is not true when an agency has previously set standards in a particular area and its new

---

[2] Instead of following *West Virginia* and examining these factors to determine whether the major questions doctrine applied, the court below, citing Justice Gorsuch's concurring opinion in *West Virginia* (joined only by Justice Alito), looked to some of them in a perfunctory fashion to determine whether the rule was *clearly authorized. Louisiana*, 2022 WL 4370448 at *10-11. But Justice Gorsuch's concurrence "does not restate the majority opinion with helpful clarifying analysis; it changes the majority opinion's approach." Natasha Brunstein & Donald L. R. Goodson, *Unheralded and Transformative: The Test for Major Questions After* West Virginia, 47 Wm. & Mary Env't L. & Pol'y Rev. 47, 91 (2022); *compare West Virginia*, 142 S. Ct. at 2610-14 (examining these factors, then explaining that "[g]iven these circumstances" the government must "point to clear congressional authorization" (internal quotations omitted)), *with id.* at 2622-23 (Gorsuch, J., concurring) (describing some of these factors as "clues" as to "what qualifies as a clear congressional statement").

regulations merely go "further than what [it] has done in the past." *Missouri*, 142 S.

Ct. at 652-53.

That is exactly what happened here. HHS has "a history of regulating the

health of Head Start staff in order to protect the children in the program." *Livingston*,

35 F.4th at 492; *see also* Appellant Br. 4-8. From the program's nationwide

beginning, standards required staff to be free of communicable diseases and

volunteers to be screened for tuberculosis. 40 Fed. Reg. 27,562, 27,565 (June 30,

1975). In 1996, regulations required tuberculosis screenings for staff and regular

volunteers. 61 Fed. Reg. 57,210, 57,223 (Nov. 5, 1996). This tuberculosis screening

subjected staff and volunteers to either an injection or radiation, *see* Appellant Br. 6,

19-20, mandating a medical procedure.

This longstanding practice "shed[s] light on the extent of power" conveyed by

the Head Start Act. *West Virginia*, 142 S. Ct. at 2610 (quoting *FTC v. Bunte Bros.,

Inc.*, 312 U.S. 349, 352 (1941)). Requiring vaccinations for staff and volunteers is

akin to past measures to prevent communicable diseases. Simply "ensuring that

providers take steps to avoid transmitting a dangerous virus" to their students, as

HHS has routinely done before, is not the type of novel action that supports applying

the major questions doctrine. *Missouri,* 142 S. Ct. at 652.

### 2. *Actions incongruent with overall regulatory scheme*

When an agency asserts authority that fits poorly within a statute's overall regulatory structure, such a "fundamental revision of the statute" militates toward applying the major question doctrine. *West Virginia*, 142 S. Ct. at 2612 (quoting *MCI*, 512 U.S. at 231). But here, the challenged rule does not transform HHS's authority "'from [one sort of] scheme of regulation' into an entirely different kind," *id.*, or plausibly "render the statute unrecognizable to the Congress that designed it," *Utility Air,* 573 U.S. at 324 (internal quotation omitted).

Head Start was created to provide "*health*, educational, nutritional, social, and other services" to low-income children and their families. 42 U.S.C. § 9831 (emphasis added). The challenged rule, which "create[s] conditions that support the health and safety of children and reduce program closures and service interruptions," furthers this purpose. 86 Fed. Reg. 68,052, 68,054 (Nov. 30, 2021).

Importantly, the statute's regulatory scheme confirms that the Secretary can establish standards to protect participants' health and safety. *See* Appellant Br. 17-18. He is empowered to set standards governing a wide variety of topics, including "such other standards" that he "finds to be appropriate." 42 U.S.C. § 9836a(a)(1). And he is tasked by Congress with the responsibility to enforce compliance with these standards, including requiring immediate corrections when the failure to meet standards "threatens the health or safety of staff or program participants." *Id.*

§ 9836a(e)(B)(i). The challenged regulation is accordingly a "straightforward and predictable example" of how the Secretary may protect participants. *Missouri*, 142 S. Ct. at 653.

### 3. *Use of vague or ancillary provisions to assert broad authority*

The Supreme Court has been particularly wary of claimed authority that rests on "'subtle device[s]'" or "cryptic" delegations. *See, e.g.*, *Brown & Williamson*, 529 U.S. at 160 (quoting *MCI*, 512 U.S. at 231). *West Virginia* itself stressed that the EPA was using an "obscure," "ancillary," "little-used backwater" for its wide-reaching regulation. 142 S. Ct. at 2602, 2610, 2613 (internal quotations omitted).

Here, the Secretary did not resort to a "little-used backwater" to issue these standards. Instead, he turned to his long-standing authority to set program performance standards for its grantees. *See* Appellant Br. 3-4. This continued use of the statute's central standard-setting authority—which has been used to impose a "litany of health-related participation conditions," *Missouri*, 142 S. Ct. at 653— provides no reason for skepticism. As in *Missouri*, this "seemingly broad language" should not be read to give the agency only the authority to promulgate "a list of bureaucratic rules regarding the technical administration" of the program. *Id.* at 652; *see* Appellant Br. 17-18.

#### 4. *Mismatch between expertise and claimed power*

The Supreme Court also considers an agency's expertise when determining if it is seeking transformative power that Congress is unlikely to have granted. *See West Virginia*, 142 S. Ct. at 2612-13 ("'when [an] agency has no comparative expertise' in making certain policy judgments . . . 'Congress presumably would not' task it with doing so" (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019))). Consistent with that presumption, the Court has concluded that Congress was "especially unlikely" to grant the IRS authority to make health insurance decisions because the IRS "has no expertise in crafting health insurance policy." *King*, 576 U.S. at 486.

Significantly, then, it does not "raise[] an eyebrow," *West Virginia*, 142 S. Ct. at 2613, that HHS would be tasked with determining how best to keep students safe and healthy when participating in Head Start. This is not the case of an "official who lacks medical expertise" weighing in on "medical judgments," *Gonzales*, 546 U.S. at 266; indeed, "addressing infection problems in [Head Start] facilities is what [the HHS Secretary] does." *Missouri*, 142 S. Ct. at 653.

#### 5. *Legislative activity implying lack of authorization*

The Supreme Court has occasionally considered congressional activity occurring after a statute's enactment as part of its major questions analysis. *E.g.*, *West Virginia*, 142 S. Ct. at 2614 (failed legislation adopting cap-and-trade scheme

suggested similar scheme was not already authorized). But *Brown & Williamson*—a key case in the doctrine's development—downplayed the probative value of such evidence, emphasizing that it did "not rely on Congress' failure to act," but instead on conflict between the agency's interpretation and other statutes addressing tobacco. 529 U.S. at 155-56; *see also Pension Benefit Gaur. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (explaining "subsequent history is a hazardous basis for inferring the intent of an earlier Congress" and "a particularly dangerous ground" for interpretation when concerning "a proposal that does not become law" (internal quotations omitted)). And the opinion below identified no evidence of "Congress' consistent judgment to deny [HHS] this power." *Id.* at 160.

## III.   Extending the Major Questions Doctrine to Cases Like This Would Undermine Traditional Statutory Interpretation and Constitutional Principles.

### A.   Textualism

When interpreting statutes, a court's "job is to interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (internal quotation omitted). After all, "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020). Looking beyond the text to "impos[e] limits on an agency's discretion" can therefore amount

to "alter[ing]" rather than "interpret[ing]" a statute. *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).

That is exactly what occurred below. By overemphasizing economic and political considerations unrelated to the text, the court below concluded that a heightened standard applied even though the authorizing statute "is arguably broad enough to encompass the Head Start Mandate." *Louisiana*, 2022 WL 4370448 at *9. Broad statutory language, however, should not be artificially constrained due to "undesirable policy consequences," *Bostock*, 140 S. Ct. at 1753, or because it "goes further than what the [agency] has done in the past," *Missouri*, 142 S. Ct. at 653 (rejecting similar claim).

Congress has granted the Secretary "the flexibility necessary to forestall [regulatory] obsolescence," enabling him to update Head Start program standards to respond to "changing circumstances and scientific developments." *Massachusetts*, 549 U.S. at 532. Applying the major questions doctrine in this context would undermine, rather than promote, "a practical understanding of legislative intent." *West Virginia*, 142 S. Ct. at 2609; *see also Bostock*, 140 S. Ct. at 1753 (rejecting "naked policy appeals" in favor of "plain language"); Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty (Sept. 6, 2022), https://lawliberty.org/major-problems-with-major-questions/.

That concern is heightened because Congress could not have anticipated when enacting the Head Start Act that courts would later require "clear authorization" for specific regulatory actions. *See* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2474 n.318, 2475 (2003) (judges should "attempt to identify the conventions in effect at the time of a statute's enactment" because legislators draft statutes in light of background legal precepts); Mila Sohoni, *The Major Questions Quartet,* 136 Harv. L. Rev. 262, 286 (2022) (it is "unfair to Congress" to apply new limiting rules "to earlier-enacted legislation").

Precisely because it departs from "routine statutory interpretation," the major questions doctrine is reserved for extraordinary cases involving efforts to transform statutes "from one sort of scheme of . . . regulation into an entirely different kind." *West Virginia*, 142 S. Ct. at 2609, 2612 (internal quotations omitted). Expanding the doctrine beyond that narrow sphere to a case like this would undermine established textualist principles.

### B.  Original Meaning

The overly broad version of the major questions doctrine adopted by the court below is in serious tension with the Constitution's original meaning because it would impose heightened requirements on Congress whenever it attempts to authorize agencies to take actions with significant economic or political consequences.  As originally understood, the Constitution embodies no skepticism toward agency

resolution of consequential policy decisions and therefore does not require Congress to speak in any particular fashion to assign such authority. Indeed, early Congresses repeatedly used broad language to grant the executive branch vast discretion over some of the era's most pressing economic and political issues.

Recent scholarship has cataloged these early assignments of authority. For example, the First Congress banned all trade and intercourse with the Indian tribes without a license, while granting the president total discretion to devise the "rules, regulations, and restrictions" governing the licensing scheme. Act of July 22, 1790, ch. 33, § 1, 1 Stat. 137, 137. President Washington used this authority to specify who could trade, what items could be traded, and where—unilaterally shaping the scope of this politically significant trade. *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 341 (2021).

The First Congress assigned similarly broad authority to address "arguably the greatest problem facing our fledgling Republic: a potentially insurmountable national debt." Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81, 81 (2021). To that end, Congress authorized the president to borrow about $1.3 trillion in new loans (in today's dollars) and to make other contracts aimed at refinancing the debt "as shall be found for the interest of the [United] States." Act of Aug. 4, 1790, ch. 34, § 2, 1 Stat. 138, 139; *see* Chabot,

*supra*, at 123-24.  The statute left the implementation of this broad mandate largely to the president's discretion.  *See id.*; Mortenson & Bagley, *supra*, at 344-45.

These statutes were not unusual.  To list just a few examples: Congress also granted the Treasury Secretary the "authority to effectively rewrite the statutory penalties for customs violations," Kevin Arlyck, *Delegation, Administration, and Improvisation*, 96 Notre Dame L. Rev. 243, 306 (2021); *see* Act of May 26, 1790, ch. 12, § 1, 1 Stat. 122, 122-23, "one of the most important and extensive powers" of the government at the time, *The Margaretta*, 16 F. Cas. 719, 721 (C.C.D. Mass. 1815) (Story, C.J.).  Congress authorized an executive board to grant exclusive patents if it deemed inventions or discoveries "sufficiently useful and important," Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, 110.  And Congress gave federal commissioners power over the politically fraught question of how to appraise property values for the nation's first direct tax.  *See* Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288, 1391-1401 (2021).

Just as the Founding-era Congress readily assigned consequential policy decisions to the executive branch, there is no basis for imposing heightened burdens on Congress when it seeks to do so today, merely because of those decisions' practical significance.  That is why the major questions doctrine looks only for

extraordinary cases in which an agency twists "vague" and "ancillary" provisions to claim "newfound power" that is "beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609-10 (internal quotations omitted). This is not such a case: here, Congress chose to grant the Secretary broad authority and concomitant flexibility to address consequential policy decisions within the scope of his expertise. *See* Appellant Br. 2-4, 20-25.

## C. Separation of Powers

The major questions doctrine is meant to promote "separation of powers principles." *West Virginia*, 142 S. Ct. at 2609. But an aggressively applied doctrine raises its own separation-of-powers concerns, threatening to become "a license for judicial aggrandizement" that transfers authority "from agencies, the President, and Congress" to the courts. Nathan Richardson, *Antideference: COVID, Climate, and the Rise of the Major Questions Canon*, 108 Va. L. Rev. Online 174, 175, 200 (2022).

If expanded beyond the narrow bounds the Supreme Court has prescribed, the doctrine risks constraining Congress's power to authorize significant agency actions, or to grant flexible authority capable of addressing new developments within an agency's expertise. More than a "check on executive power," this would restrict legislative authority by "direct[ing] how Congress must draft statutes." Sohoni, *supra*, at 276.

Here, for instance, Plaintiffs-Appellees seek to use the major questions doctrine to effectively rewrite the Head Start Act, asking the judiciary to impose extratextual limitations on the Secretary's ability to set performance standards for grantees. But "[w]hen courts apply doctrines that allow them to rewrite the laws (in effect), they are encroaching on the legislature's Article I power." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2120 (2016) (book review). And skewing a statute's meaning because of political controversies or other developments arising after its enactment would risk "amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (internal quotations omitted).

This potential for encroachment on congressional prerogatives further underscores the need to reserve the doctrine for truly "extraordinary" cases. Applying it whenever an agency makes a costly or controversial decision would place the courts in an especially fraught position. If the judiciary "starts to reject Congress's legislation on important matters precisely because it is important," this could erode courts' perceived status as non-political arbiters of the law. Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Envtl. L. J. 379, 391 (2021).

Furthermore, while the doctrine is meant to reflect "a practical understanding of legislative intent," *West Virginia*, 142 S. Ct. 2609, applying it too broadly would

be at odds with Congress's demonstrated intent to allow agencies to make decisions with dramatic economic consequences.  The Congressional Review Act requires federal agencies to report new rules to Congress and to identify "major" rules, which "shall take effect" unless Congress acts to disapprove them.  5 U.S.C. § 801; *see id.* § 804 (defining such rules under the Act by their economic effect).  Applying the major questions doctrine to all costly agency actions would upend this statute and the congressional policy it embodies, replacing its "*major-rules-are-valid-unless-rejected* framework with the judge-made *major-rules-are-invalid-unless-approved* framework." Squitieri, *Major Problems*, *supra*.

These concerns are not alleviated by Congress's ability to pass legislation after a judicial decision.  "For a court to say that Congress can fix a statute if it does not like the result is *not* a neutral principle in our separation of powers scheme because it is very difficult for Congress to correct a mistaken statutory decision." Kavanaugh, *supra*, at 2133-34.  Potential future correction "is not a good reason for courts to do anything but their level best to decide the case correctly in the first place." *Id.* at 2134.

In sum, the major questions doctrine's heightened standard of clarity applies not merely when an agency acts on a matter of vast economic and political significance, but only when additional factors together reveal that an agency is seeking a "transformative expansion" of the power Congress meant to assign it.

*West Virginia*, 142 S. Ct. at 2610. Stretching the doctrine beyond those extraordinary cases would not serve, but instead would severely undermine, the separation of powers.

## CONCLUSION

For the foregoing reasons, the decision below should be reversed and the permanent injunction vacated.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
J. Alexander Rowell
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: March 10, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on March 10, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 10th day of March, 2023.

> */s/ Brianne J. Gorod*
> Brianne J. Gorod
> *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because it contains 6,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached *amicus* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 10th day of March, 2023.

*/s/ Brianne J. Gorod*
Brianne J. Gorod
*Counsel for Amicus Curiae*